The **HUNKIN CONKEY CONSTRUC-TION COMPANY**

v.

The **UNITED STATES.**

No. 170–70.

United States Court of Claims.

June 16, 1972.

Thomas B. Treacy, New York City, attorney of record, for plaintiff; George F. Mackey, Jarvis, Pilz, Buckley & Treacy, New York City, of counsel.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DURFEE, Senior Judge:

Plaintiff, the Hunkin Conkey Construction Company hereinafter referred to as either the contractor or plaintiff], entered into Contract No. DA–36–058–CIVENG–62–109 on October 16, 1961 with the United States, acting through the Army Corps of Engineers. The contract provided, *inter alia*, that the contractor would furnish all labor, materials and equipment, except for certain Government-furnished property, and perform all work necessary for the construction of Kinuza Dam, to be located on the Allegheny River in northern Pennsylvania.

During performance of the contract, it was discovered that the alluvial foundation mterials in the embankment area included alternate strata of fine sand and coarse open gravel. Unless corrective measures had been taken, the high pressure heads from the water which would permeate these layers could have caused the foundation of the embankment to fail, and the dam to collapse. By letter dated March 26, 1963, the contractor formally notified the resident engineer of this condition, which the contractor thought to be a "changed condition."

This claim is pending before the Corps of Engineers Board of Contract Appeals (Eng.BCA No. 2945) and is not in any way involved in this litigation. Following the notice of a possible changed condition, the Corps of Engineers began an intensive investigation of the permeable soils problem. Various test borings were made and the Corps began to contact various contractors who specialized in the construction of cut-off walls. At the same time, the Corps was urging the contractor to consider the possibility of an alternative method of cut-off, such as a concrete blanket or a slurry trench. In addition to considering the feasibility of an alternative method, the contractor solicited proposals for the construction of a cut-off wall from Spencer, Rodio & Soletanche, Inc., Icanda, Limited, and the Petrifond Foundation Company, Limited. By letters dated October 31 and November 7, 1963, the contractor forwarded two tentative proposals to the Corps of Engineers which incorporated estimates received from Spencer, Rodio & Soletanche, and Icanda, respectively. Subsequently, the Government decided to utilize a concrete cut-off wall, and at a meeting with Government representatives on January 31, 1964, the contractor was furnished with preliminary drawings showing the various sections of the wall and its proposed location. A work and payment schedule was also discussed. The contractor was told that the final plans and specifications were being prepared in such a manner that if the negotiations with the contractor proved to be fruitless, the work could be immediately advertised for bids.

In March 1964, the Government's plans and specifications were sent to three specialty firms and to plaintiff with the request that plaintiff submit a proposal for the work, as prime contractor. The Government and plaintiff were unable to agree on the price for this additional work and therefore, on May 9, 1964 Government representatives sought, and subsequently obtained, authority to procure the construction of the cut-off wall by negotiation pursuant to 10 U.S. C. § 2304(a) (2) and 32 C.F.R. § 3.202. Accordingly, in the latter part of May 1964, the contract for the construction of the cut-off wall (Contract No. DA–36–058–CIVENG–64–692) was awarded to Icanda, Limited. The estimated amount of this contract was $2,374,086.-00 as contrasted with plaintiff's initial proposal of approximately $2,700,000.00, which was subsequently reduced by $75,000.00.

Plaintiff has completed performance on its contract for the construction of the Kinuza Dam, and this work has been accepted by the Government. The same is true with regard to the contract awarded to Icanda for the construction of the cut-off wall. Plaintiff contends that the Government breached its contract for the construction of the dam by awarding the contract for the cut-off wall to another contractor. As a matter of law, plaintiff must fail in this contention.

The construction of the cut-off wall was not provided for by the terms of the contract between plaintiff and the Government. Plaintiff contends, however, that since it was within the "general scope" of the contract, as that term is used in Article 3 of the general provisions, the "changes" clause,[1] the Gov-

---

1. The "changes" clause in the subject contract provides, in pertinent part, that, "[t]he Contracting Officer may, at any time, by written order * * * make changes in the drawings and/or specifications of this contract if within its general scope. If such changes cause an increase or decrease in the Contractor's cost of, or time required for, performance of the contract, an equitable adjustment shall be made and the contract modified in writing accordingly. * * * If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 of these General Provisions; but nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed."

ernment was foreclosed from awarding a separate contract for the construction of this wall to another contractor. It is plaintiff's position that this work should have been accomplished through a change order, with the disagreement over the price being resolved by the disputes procedure.

Even assuming that the "changes" clause, standing alone, is susceptible to the interpretation urged by plaintiff such an interpretation is untenable in light of the "other contracts" clause, also contained in the subject contract, which provides that,

> [t]he Government may undertake or award other contracts for additional work, and the Contractor shall fully cooperate with such other contractors and Government employees and carefully fit his own work to such additional work as may be directed by the Contracting Officer. The Contractor shall not commit or permit any act which will interfere with the performance of work by any other contractor or by Government employees.

If at all possible, a contract should be read as a whole and effect should be given to all of the contract terms. *See, e. g.,* Trans International Airlines v. United States 351 F.2d 1001, 173 Ct.Cl. 312 (1965). *Additional work* as used in the above quoted provision simply means work not covered by the terms of the contract. *See,* John A. Johnson Contracting Corp. v. United States, 132 F. Supp. 698, 706, 132 Ct.Cl. 645, 660 (1955). Consequently, when the subject contract is read as a whole it provides that the Government may issue change orders for work within the general scope of the contract; however, the Government may instead award other contracts for such work. The case at bar does not present a situation in which the contractor was delayed or in any way hindered in its performance by the award of additional work to another contractor, and there is no need to determine what the

result might be if either of these additional factors were present.

Plaintiff has cited Lovell v. United States, 59 Ct.Cl. 494 (1924) as holding that "the Government breached its agreement with plaintiff when it went 'into the market' to have additional sewer work performed." In *Lovell,* the Government "deprive[d] the contractor of doing work clearly within the terms of the contract." *Lovell, supra* at 516. The contract expressly provided that if a certain sewer were to be constructed, plaintiff would do the work; however, notwithstanding this provision, the Government had the work performed by another contractor. This is not the situation presented in the case at bar. The construction of the cut-off wall was not within the terms of the subject contract. In contending that the contractor should not be deprived of work which should be performed pursuant to the agreement, plaintiff merely states a tautology.

Plaintiff neglects to mention that if the contracting officer had issued a change order and the construction of the cut-off wall were outside the general scope of the contract, and it is by no means clear that it was not, the Government would have been in breach of contract, absent other circumstances, such as a supplemental agreement having the effect of an accord and satisfaction. *See,* Keco Industries v. United States, 364 F.2d 838, 176 Ct.Cl. 983 (1966) cert. denied 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 105 (1967). *See generally,* Merritt-Chapman & Scott Corp. v. United States, Ct. of Cl., 458 F.2d 42, decided April 14, 1972; Brock & Blevins Co. v. United States, 343 F.2d 951, 170 Ct.Cl. 52 (1965); Cooper v. United States, 84 Ct.Cl. 436 (1937). Under plaintiff's theory the Government is in breach because the additional work was within the general scope of the contract, and was given to another contractor. In a situation such as this, when the contracting officer is faced with the deci-

sion of either issuing a change order to the original contract, with the parties in disagreement over the price, or having the work performed by another contractor, absent a supplemental agreement, the only time the Government will not be in breach of contract under plaintiff's theory is when the contracting officer is correct in his determination of whether the additional work to be performed falls within the general scope of the contract.[2] In other words, if because of disagreement over the price or some other reason, the Government and the original contractor are unable to enter into a supplemental agreement covering additional work, the contracting officer would be constrained to do one of the following: (1) accede to the contractor's demands in order that the parties might enter into a supplemental agreement; (2) not have the additional work performed at all; (3) issue a change order to the original contract, thus exposing the Government to potential liability for breach should the additional work be without the general scope of the contract; or (4) enter into a contract with another party, exposing the Government to potential liability for breach if the work is within the general scope of the original contract. It cannot be supposed that it was the intent of the parties to achieve a result such as this, and any doubt in this regard is dispelled by the express provisions of the contract. *See, e. g.,* Dittmore-Freimuth Corp. v. United States, 390 F.2d 664, 182 Ct.Cl. 507 (1968).

Defendant's motion for summary judgment is granted, plaintiff's cross-motion for summary judgment is denied, and plaintiff's petition is dismissed.

2. The determination of whether a change is within the "general scope" of the contract, involves a consideration of the magnitude and the quality of the change in light of the original purpose of the contract. Keco Industries v. United States, *supra.* Consequently, this determination may involve close questions of law and fact.